**Frankie & Gentile, P.C.**
Attorneys at Law
1527 Franklin Avenue
Suite 104
Mineola, New York 11501

James G. Frankie
Joseph A. Gentile

Phone: 516-742-6590
Fax: 516-742-6875

October 29, 2013

Hon. Dora L. Irizarry
United States Courthouse
225 Cadman Plaza East, Room 4A South
Brooklyn, NY 11201-1818

Re: <u>United States v. Arif Kurti</u>
    11CR00486 (SI)-004 (DLI)
    <u>Pre-Sentence Memorandum</u>

Dear Judge Irizarry:

    This letter, with attached exhibits, constitutes a pre-sentence memorandum on behalf of the defendant, Arif Kurti. At the present time, the probation department has calculated an adjusted offense level of 30 in Criminal History Category I which carries a guideline range of 97-121 months. This estimate differs from the plea agreement which calculated a guideline range of 78-97 months predicated on an adjusted offense level of 28. Both of these calculations do not include a two level reduction for a global disposition which is referenced in the plea agreement and is applicable for all the related co-defendants who have pled guilty in this matter.

    This pre-sentence memorandum will urge the court to reject the computation of the probation department and accept the analysis in the plea agreement based on the probation department's inclusion of a two level enhancement by the department which constitutes an ex post facto violation under the relevant case law. Also the guideline enhancement should not apply while Mr. Kurti was incarcerated in Albania. Secondly, Mr. Kurti served sixteen months in an Albanian jail after an Eastern District warrant had been filed in Albania under extremely harsh and barbaric penal conditions; accordingly, a variance/departure would be appropriate under these circumstances.

    For these reasons, a two-level global reduction under the plea agreement would result in an adjusted offense level of 26 with a guideline of 63-78 months. Based on the circumstances of incarceration in Albania, as well as other relevant 18 U.S.C. 3553(a) factors, it is submitted that Mr Kurti should be sentenced to the statutory minimum sentence of (60) months.

I) <u>Ex Post Facto Violation and the Absence of Direct Involvement During Albanian Incarceration - Application of Guidelines 2D1.1 (b) (14) (c)</u>

The probation department attempts to assign a two point enhancement predicated on the view that, based on the assignment of points as a manager or supervisor, an individual defendant's guideline will be increased by two points if the defendant was "directly involved in the importation of a controlled substance." However, subdivision 14 of Section 2D1.1 first appears in the 2011 guideline book and does not appear in the 2010 Guideline Manual. Accordingly, this would appear to be an October, 2010 amendment which never appeared in a Guideline manual prior to that time.

It is conceded by all parties the transport of marijuana from Canada to the U.S. and any involvement with ecstasy occurred in 2000-2003 (see paragraph 147 of report) while Mr. Kurti was subsequently incarcerated in Albania in 2008. The activity in question occurred between 2000 and 2003 several years prior to the adoption of the importation guideline. Accordingly, the department is attempting to apply a 2011 guideline to conduct that dates back nine years earlier, which is simply inappropriate. Likewise, with regard to any activity in 2010-2011, Mr. Kurti was in custody in an Albanian jail; accordingly, he did not have any <u>direct involvement</u> in the importation of a controlled substance. The nature of his incarceration was such that any involvement was peripheral and secondary but clearly not direct involvement with the importation of any controlled substance.[1]

The *ex post facto* provision has two principal purposes. First, it seeks to prevent legislatures from "enacting arbitrary or vindictive legislation." *Miller v. Florida*, 482 U.S. 423, 429 (1987). Second, it endeavors "to assure that legislative Acts give fair warning of their effect and permit individuals to rely on their meaning until explicitly changed." *Weaver v. Graham*, 450 U.S. 24, 28-29 (1981). Two elements must exist for there to be a violation of the *Ex Post Facto* Clause. First, the law "must retrospective, that is, it must apply to events occurring before its enactment." *Weaver*, 450 U.S. at 29. Second, the law must be a penal statute that disadvantages the defendant affected by it. See *Collins v. Youngblood*, 497 U.S. 37, 41 (1990).

Retroactive application occurs when the conduct sought to be penalized occurs before the statute becomes effective. First, although the courts generally look to the time period alleged in the indictment, the Second Circuit has indicated that it is proper for a district court to analyze the facts in the particular case to determine whether the offensive conduct in question occurred prior to the termination date in the indictment. *United States v. Kilkenny*, 493 F.3d 122 (2d Cir. 2007). In *Kilkenny*, the court concluded it was error for the court to rely on the date listed in the information charging bank fraud as a basis for determining an ex post facto violation. In fact, the court concluded the dates in the indictment are not dispositive and that a district court should look to the last date of offensive conduct. *Kilkenny* at 128. See also *United States v. Foote*, 413 F.3d 1240, 1250 (10th Cir. 2005) (finding that uncontradicted evidence established that offense

---

[1] As referenced in the objection letter, there was no actual importation or transfer of any cocaine and Mr. Kurti had no direct involvement with the particular circumstances surrounding marijuana importation.

2

ended on December 7, 1998, despite statement in the indictment that conspiracy contained until October 2000). Recently, the United States Supreme Court reaffirmed the vitality of the *ex post facto* clause by confirming a violation where the loss provisions under the guidelines had changed between 1999 and 2009 in a fraud case resulting in significantly greater sentence exposure to the defendant. The court concluded that the *ex post facto* clause was violated by sentencing the defendant under current guidelines rather than those in effect at the time of the offense. *Peugh v. United States*, 133 S.Ct.2072 (2013).

In the present case, the indictment traces a history from calendar year 1999 until 2011. Accordingly, it is only the last year of the indictment which has applicability to the passage of the guideline from a temporal standpoint. However, in accordance with *Kilkenny*, there is no question that the marijuana transportation, as well as any other incidents occurred prior to Mr. Kurti's incarceration in Albania in 2008, three years before the enactment of the guideline. Further, it appears that the marijuana incident was completed in 2002 and the allegations relating to the Holland incident were completed by calendar year 2003, eight years prior to the enactment of this guideline provision. Finally, any allegations reflecting involvement in 2010-2011 occurred while Mr. Kurti was incarcerated in Albania and virtually precludes any direct involvement with the importation of a controlled substance. For this reason, the guideline enhancement should be denied.

Additionally, there is no reference to this provision in the plea agreement as contemplated by the parties, as Mr. Kurti's involvement with importation was not predicated on the wiretap investigation in the late 2000's, but information from informants regarding conduct in calendar years 2000-2003. Therefore, there was no basis for computing the guideline factor into the adjusted offense level computation within the plea agreement. For this reason, the parties did not view the enhancement to be applicable to the facts in the present case and there is no reference to this guideline within the plea agreement. Accordingly, this court should reject the application of the two level enhancement and apply the offense level of 28 formulated in the plea agreement.

II. Logjam Adjustment

The plea agreement in the present case contemplated a two point downward adjustment predicated on a global disposition in the present matter. As the court is aware, paragraph 14 of the plea agreement outlined ten co-defendants as a trial grouping whose cases were required to be resolved in order to receive the logjam adjustment. Further, the assigned Assistant United States Attorney has indicated that the government would not oppose this application based on the resolution of the co-defendants cases on the original indictment.

Pursuant to Section 5K2.0 of the guidelines, the plea agreement entered into by all the defendants with the government agreed to a two point reduction predicated on a "logjam adjustment." The reason for the adjustment is that the government was able to obtain a multi-defendant plea disposition in a complex case involving multiple informants and extensive wiretap litigation without the necessity of a trial or even pretrial motion litigation. The global nature of this disposition conserved substantial judicial resources by accelerating the resolution

of this matter. All of the attorneys engaged in the extensive joint co-counsel discussion with their clients to achieve a resolution in this matter.

For these reasons, the recognition of a two point logjam adjustment is reasonable and consistent with the Second Circuit reasoning in *United States v. Garcia*, 927 F.2d 125 (2d Cir. 1991), which has approved a two or three point reduction predicated upon a "logjam adjustment."

The acknowledgement of a two point "logjam adjustment" would amend the Total Offense Level to a Level 26 as indicated in the plea agreement.

### III. SECTION 3553 (a) FACTORS INCLUDING THE PERSONAL HISTORY AND CHARACTERISTICS OF THE DEFENDANT WARRANT THE IMPOSITION OF A NON-GUIDELINE SENTENCE.

The Supreme Court's decision in United States v. Booker and Fanfan 125 S.Ct. 738 (2005) requires a sentencing court to consider guideline ranges, but permits the court to tailor the sentence in light of the statutory concerns in Section 3553(a). The Second Circuit has also indicated that the proper application of Booker requires a sentencing court to consider the guideline along with 18 USC Section 3553(a) which, as a result of Booker and Fanfan, have taken on a "renewed vitality." United States v. Williams, 475 F.3d 468, 472 (2d Cir. 2007).

Further, the parsimony provision of Section 3553(a) states that a court shall impose a sentence sufficient, but not greater than necessary, to comply with the provisions set forth in paragraph 2 of this subdivision. The court is statutorily bound not to impose a sentence greater than what would be necessary to comply with the relevant sentencing provisions in the statute. See United States v. Castillo, 460 F.3d 337, 354 (2d Cir. 2006). Additionally, the Second Circuit has stated that:

> We have recognized that District Courts are to impose sentences pursuant to the requirements of Section 3553(a)-including the requirements of Section 3553(a)'s parsimony clause-while appellate courts are to review the sentences actually imposed by District Courts for reasonableness. United States v. Williams, 475, F.3d 468 (2d Cir. 2007).

More importantly, in Gall v. United States, 128 S.Ct. 586 (2007), the Supreme Court has indicated that there is no quantitative correlation between the amount of the departure and the basis for the departure. Further, the district court judges have wide discretion to fashion an appropriate sentence and that the "reasonableness" issue on appeal will now be governed by an "abuse of discretion" standard in analyzing a district court sentence.

The concept that a sentencing court has a wide latitude to decide the proper degree of punishment for an individual offender and a particular crime was once again affirmed by the Second Circuit in United States v. Cavera 550 F.3d at 189 (2d Cir. 2008). In addition to taking

4

into account the applicable guideline range, a sentencing court must form its own view of the "nature of circumstances of the offense and the history and characteristics of the defendant" Cavera, 550 F.3d at 188, See 18 Section 3553(a)(1). A sentencing court must also consider:
a) the need to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for that offense; b) the need to afford adequate deterrence to criminal conduct; c) the need to protect the public from further crimes by the defendant; and d) the need for rehabilitation (Section 3553 (a) (2)). Cavera, 550 F.3d at 188. Moreover, sentencing courts must take into account; the kinds of sentences available (Section 3553(a)(3)); any pertinent Sentencing Commission policy statement (Section 3553(a)(5)); the need to avoid unwarranted sentence disparities among similarly situated defendants (Section 3553(a)(6)); and, where applicable, the need to provide restitution to any victims of the offense (Section 3553(a)(7) Cavera, 550 F.3d at 188-189.

### A)  PUNITIVE TREATMENT AND INCARCERATION DURING PERIOD OF EXTRADITION

In United States v. Carty, 264 F.3d 191 (2d Cir.2001), the Second Circuit held that pre-sentence confinement conditions may, in appropriate cases, be a permissible basis for a downward departure. In Carty, the defendant was confined in the Dominican Republic pending extradition. The defendant claimed that during his nine (9) month confinement he lost forty (40) pounds and was kept in a 4'x 8' cell with three other prisoners with no lights or running water and was permitted outside only fifteen (15) minutes per day and granted only one (1) telephone call per week. On this record, the Second Circuit recognized the severity of the conditions and acknowledged that this type of confinement would take a particular case outside the heartland of the guidelines.

Traditionally, the courts have recognized a downward departure based on an individual defendant whose status has resulted in his placement in solitary confinement. See, e.g., United States v. Smith, 27 F.3d 649 (D.C. Cir. 1994); United States v. Graham, 83 F.3d 1466 (D.C. Cir. 1996); United States v. Long, 997 F.3d 1264 (8th Cir. 1992). Further, decisions in the Second Circuit have affirmed District Court departures based on circumstances where a defendant has been incarcerated in a harsher environment than would typically occur to a defendant in the general population. See, United States v. Hernandez-Santiago, 92 CF.3d 97 (2d Cir. 1996) (noting that  the District Court granted a downward departure of three levels based on defendants' twenty-two (22) month incarceration in a state facility which was a "harsher incarceration"). See also, United States v. Sutton, 973 F.Supp 448 (DNJ 1997) (holding that a sentencing court is not foreclosed as a matter of law from considering the pre-trial incarceration as a basis for departing downward).

This court is familiar with the Second Circuit decision in United States v. Lara, 905 F.2d 599 (2d Cir. 1990), where the court authorized a downward departure due to the unique nature of possible victimization of the potential defendant. However, the Lara decision is also relevant to the present case for another reason. In that case, the particular defendant was required to be placed in solitary confinement during the course of his incarceration as the result of a propensity

5

for him to be victimized due to his sexual orientation by placing him into solitary confinement and the Second Circuit noted that such a situation constitutes a basis for a downward departure.

For these reasons, the courts have recognized departures predicated on the stress, uncertainties, and lengthy nature of pre-trial incarceration. A court may depart if the defendant has suffered from unusual stress due to a lengthy or particularly stressful incarceration. United States v. Ekwunoh, 888 F. Supp. 3690 (E.D.N.Y. 1994); United States v. Hoffenberg, 1997 WL 96562 (S.D.N.Y. March 5, 1970). The courts have recognized that where extraordinary stress results from the nature of the incarceration, and such a circumstance manifests itself in physical illness, a District Court may consider the resulting health issue as a consequence of the nature of incarceration in granting a downward departure. See United States v. Salvador, 98 CR 484 (LMM), 2006 WL 2034637 (S.D.N.Y. 2006) (court recognized that the harsh nature of the overseas incarceration warranted a departure).

In this case, Mr. Kurti remained in an unhealthy and toxic type of environment as the result of his incarceration in Albania jails. In 2008, Mr. Kurti was arrested for narcotics trafficking with several individuals, received a five year sentence, but was entitled to be released in the summer of 2011 based on approximately 75% good time credit in the Albania jail system.[2] However, he was not released during the summer of 2011 as various extradition proceedings were instituted in order to bring him to the United States to confront the Brooklyn indictment pending before the court. During this time, and prior to 2011, Mr. Kurti essentially was incarcerated at three institutions which can only be characterized as barbaric. During the extradition period, he was incarcerated at the #313 Penitentiary in Tirana, Albania. Previously, he had been incarcerated at the Shenkoll facility located in Leshe, Albania, and was subsequently incarcerated in Pequin, Albania.

These facilities are notorious for having poor medical care and, in fact, other than providing a patient with aspirin, did not supply any medical practitioners other than an occasional nurse for the care of the inmates. Additionally, there was no heat or hot water at these locations. Unfortunately, there were times when the temperature would reach 15 degrees below zero and the inmates would have to suffer without the benefit of heat and running hot water. Such circumstances can only be classified as unduly harsh and punitive.

Enclosed with this letter are excerpts of a report from the Counsel of Europe Anti Torture Committee which visited the prison facility No. 313 in Tirana, Albania. With regard to this facility the report highlights that there have been allegations of physical abuse treatment including slaps, kicks and body punches by members of the "Special Investigation Group" who transferred prisoners to disciplinary cells. The report also indicated that the cells in facility No. 313 are overcrowded and that it is an old building with structural problems including limited

---

[2] It should be noted that Mr. Kurti was arrested in Albania with five co-defendants, all of whom were released in the summer of 2011. The attached Albanian court decision indicated Mr. Kurti was to be held over for 60 days effective August, 2011 in order for the extradition papers to be filed. Once the papers were filed, he remained in custody until he was later extradited. Accordingly, Mr. Kurti was not extradited to the Eastern District until November of 2012 and remained incarcerated at the Tirana facility.

access to natural light, poor ventilation and no call bells. The committee also noted the absence of proper hygiene products such as toilet paper, soap and that the diet at the facility is monotonous and lacking fruit and vegetables. Overall, the committee report confirms that the facility conditions in penitentiary No. 313 are only marginally above the level of barbaric.

For these reasons, it is submitted that the punitive conditions at the Albanian prisons are excessive and Mr. Kurti spent sixteen (16) months at this location pending extradition while the Brooklyn case was prosecuted from July of 2011 until his arrival in November 2012. Enclosed with this memorandum is a court decision in Albania which recognizes that the Eastern District arrest warrant was filed against Mr. Kurti in July of 2011. Our office has furnished, as an exhibit, the original document and a translation of the document for the benefit of the court. Despite the filing of the warrant in the summer of 2011, Mr. Kurti was not processed and received at a United States facility until November 19. 2012. Accordingly, it is requested that this court evaluate his sentence for a departure or variance predicated on the sixteen month time period in a highly punitive setting awaiting extradition to the United States.

B) PERSONAL AND FAMILY CIRCUMSTANCES

As referenced in the probation report, Mr. Kurti is forty-three (43) years old and has four children, ages seventeen to twenty-three, as the result of his marriage in 1988 to his wife, Zizi Kurti. Mr. Kurti has a good relationship with all of his children and speaks to them with regularity by telephone. Also, prior to his incarceration in 2008, Mr. Kurti furnished monthly support to the family and would typically contribute $1,000.00 per month towards the family finances.

In approximately 2001, Mr. Kurti and his wife emotionally separated, although Mr. Kurti always provided economic and financial support to their children. After he met Linda Gjini in 2001, they ultimately relocated to Canada and Albania. Ms. Gjini and Mr. Kurti have two children, ages 6 and 5, and this family has likewise received economic support from Mr. Kurti's family. Accordingly, Mr. Kurti has always attempted to provide emotional and economic support to this young family as well.

A classic example of Mr. Kurti's impact on his children is reflected in the eloquent letter of his daughter, Linda, to the court on behalf of her younger siblings. In her own words, she summarized their feelings in the following manner:

> Now that my father is not around, I realize there were many
> things that I had taken for granted while he was around and
> in our daily lives. And despite what my father may have
> done in the past, it is not indicative of the man I know him to
> be. The man I know is a caring father, always thinking about
> his family's safety and supporting us through the good and
> bad, in every way possible.

7

Additionally, enclosed are a series of letter from family and friends which attest to the positive background and character of Mr. Kurti. Valbona Cassilino, the sister of the defendant, writes to the court and describes Arif as a "generous, loving and compassionate human being." Further, she indicates he would always protect his sister growing up and would provide assistance to those individuals who were economically depressed and less fortunate. Her husband, Steven, describes an incident in the Dominican Republic when Arif stopped a taxi ride so that he could provide destitute children with some tee shirts and money, as the children were essentially playing in the streets of the Dominican Republic without the benefit of clothing.

Mr. Kurti's parents are both elderly and ill, and are incapable of writing letters directly to the court. However, Bouchra Kallami, a friend of Mr. Kurti, wrote to Your Honor that Mr. Kurti's parents miss him very much, as do his children, who "need him in their lives." Ms. Kallami grew up with Arif in the same building complex and describes him as a "good, caring and honorable person."

Therefore, Mr. Kurti's dedication to his children and family cannot be overstated and constitute a proper basis for evaluating his family circumstances in the context of a just and equitable sentence.

CONCLUSION

The plea agreement in the present case calculated a guideline sentence of 78-97 months prior to a two point reduction for a logjam adjustment, which would reduce the sentence to Level 26 in Criminal History Category I, which carries a range of 63-78 months incarceration. Moreover, the defendant spent <u>16 months</u> under barbaric conditions in an Albanian jail while awaiting extradition for a warrant filed in July of 2011, yet he was not actually delivered into the United States until November of 2012.

For these reasons, on behalf of the defendant, counsel is requesting the imposition of the mandatory minimum sentence of sixty (60) months, which would not take into consideration much of the extradition time in the Albanian facility, yet would appear to be more than justified based on all of these circumstances.

        Very truly yours,

        *[signature]*

        Joseph Gentile

JG:pmf

8